WILLIAM B. HOLDSWORTH, as Master and Agent for the Owners of the British Bark "BESSIE," Respondent, v. P. A. DE BELAUNZARAN and RAPHAEL DE FLOREZ, Appellants.

*Payment — when the debtor is released by an agreement, making an alteration in the mode of payment, entered into between the creditor and the debtor's agent.*

The plaintiff chartered his vessel to the defendants for a voyage to Spain and back. By the charter-party the defendants agreed to pay the sum of £620 sterling, at Cadiz, "in Spanish gold coin, at the rate of four dollars and eighty cents to the pound sterling, * * * in cash, without credit, discount or commission." After the arrival of the vessel at Cadiz the agent of the defendants, for the purpose of that charter, received, to the plaintiff's knowledge, freight, more than sufficient in amount to pay the amount due to the plaintiff. A portion of the amount due was paid in cash, the balance the agent agreed, upon the plaintiff's request, to remit by draft direct to Baring Bros., London, as soon as possible. The agent subsequently told the plaintiff he had sent the draft. The plaintiff never saw the draft, nor did he inquire as to how the agent procured it, or by whom it was drawn. The draft sent by the agent was drawn by himself on the defendants, and payment thereof was refused by them on the ground that the drawer had no funds in their hands. The plaintiff having taken up the draft brought this action, to recover the balance of the payment due to him at Cadiz.

*Held*, that by directing the defendants' agent at Cadiz to remit the amount due to him to Baring Bros., instead of requiring him to pay it, in cash, from the money he then held, the plaintiff discharged the defendants from all further liability therefor. (Daniels, J., dissenting.)

Appeal from a judgment in favor of the plaintiff, entered on the report of a referee.

This action was brought to recover a balance alleged to be due under a charter of the plaintiff's vessel to the defendants.

The complaint sets out the charter party of the "Bessie" in full, and alleges that of the $5,200 to be paid $2,447.60 are still due and unpaid.

The answer admits the chartering of the vessel as alleged, and the completion of the voyage. It sets forth the acceptance of a certain draft by the plaintiff under circumstances which, it is claimed, operate to release the defendants, and it also pleads payment, and accord and satisfaction. By order of the court a reply was served, which admits many of the allegations of the answer.

The issues so framed were referred by consent to a referee, who reported in favor of the plaintiff. The defendants excepted to certain portions of the referee's report and to his refusals to find as requested.

Judgment was entered on the referee's report on the 6th of October, 1882, in favor of the plaintiff, for $3,090.11, from which judgment the defendants, on the 8th of October, 1883, appealed.

The facts in the case were substantially as follows:

On the 12th of November, 1881, while the plaintiff's vessel was lying in the port of New York, a charter party was entered into between the master and the defendants' firm for a voyage from here to Spain and back. Under this, as modified, on the 2d of December, 1881, the sum of £620 sterling was to be paid at Cadiz. It was expressly agreed that the payments should be there made "in Spanish gold coin, at the rate of $4.80 to the pound sterling, * * * in cash, without credit, discount or commission." Thus, at the agreed rate of exchange, the sum of $2,976 was payable in coin at Cadiz, and it was admitted by the plaintiff that he received, on account of that sum, $528.39, leaving the $2,447.61 alleged by the plaintiff to be due.

The charter party, besides specifying that payments at Cadiz were to be made in Spanish gold coin, in cash, further provided that the bills of lading were to be signed as presented without prejudice to the charter, and that the vessel was to be consigned to the charters' agent at Cadiz, free of commission.

On the 2d of December, 1881, the vessel being ready for sea, the defendants wrote a letter directing the plaintiff to proceed to Gibraltar and thence to Cadiz, and there consign himself to "our friends, Messrs. Poggio Hermanos," who had full instructions and would serve the plaintiff with pleasure in any matter concerning his vessel. Poggio Hermanos, or Poggio Brothers, was the name under which one Salvador Poggio traded at Cadiz. He was the defendants' agent at Cadiz for the purposes of the charter, and not otherwise. On the arrival of the "Bessie" at Cadiz, the plaintiff reported to Poggio and discharged the cargo. The freight, amounting to $3,057.08, or about eighty dollars more than the amount payable to the plaintiff, was collected by Poggio, with the knowledge and by the consent of the plaintiff. A portion of the amount

payable to the plaintiff was paid in cash and a part by a banker's draft, as to which no question was made. Poggio also cashed two drafts drawn by the plaintiff against his homeward freight. The balance now claimed by the plaintiff was included in a draft for £509 18s. 4d. with regard to which the plaintiff's story was as follows : " On my arrival at Cadiz, Poggio asked me if I wished to remit ; I told him to remit direct to Baring Brothers ; I wanted to remit as soon as possible, too ; I was on board two days ; during that time he had sent this draft, and when I came ashore he told me he had remitted all right ; he told me he would buy it for me and send it on ; I never saw the draft or the money or anything else ; he said he would buy it for me, and I took his word as a man of honor and a gentleman ; I don't remember asking him for the money, in cash ; I said I would have it remitted to Baring Brothers right away ; he said he had bought a bill and sent it on ; I did not ask him how he had bought the bill, nor on whom it was drawn, nor what he had done with it ; Poggio told me he had remitted the amount to Baring Brothers ; I think he told me, when I went to the office, that he remitted the draft or the bill to Baring Brothers ; on my arrival, Poggio asked me if I wished to remit, and I said I wished to remit as soon as possible to Baring Brothers ; he said he would remit it right on to them ; I had been a week there and the cargo was half out, and he told me that he had remitted that amount to Baring Brothers by bill or draft, I won't be certain which now ; I was going to write to Baring Brothers ; he said no, he would write at the same time ; it would be all right ; need not trouble myself about it ; I did not know he had remitted his own draft ; that amount of £509 18s. 4d. I suppose is what he had of the freight collected ; I don't know but I told him to send the freight on here as soon as possible ; he told me what amount he had sent ; he told me it was sent by bill or draft ; I did not want to question the man ; he was a man that I thought was highly respected there, in Cadiz, and a man of money too ; I thought his word was as good as his note any time ; he told me he had bought that first draft at a very good rate — forty-seven pence per dollar ; the second draft, for £136 5s., was paid ; I bought that myself ; I went with Poggio to buy it, and he bought it from somebody else, and I sent it on ; I knew by whom it was drawn, and on whom."

*G. L. Rives*, for the appellants.

*J. A. Shoudy*, for the respondent.

BRADY, J. :

The draft mentioned and now in question was in fact drawn by Poggio on the defendants, in favor of Baring Brothers, at sixty days sight, and which the referee finds Poggio was not authorized to draw on the defendants, Poggio Brothers having at that time no funds with them. It was drawn on the 15th of February, 1882, and was presented for acceptance on or about the first of March following. It was again presented on the 9th of May, 1882, when payment was refused and the bill protested for nonpayment. On the sixth of March the vessel sailed from Cadiz, with a cargo of salt, for Gloucester, Mass., arriving at that port about the fourteenth of April. On the second of May and after the plaintiff had heard that the defendants refused to pay or accept the draft, he gave a receipt for nineteen hundred and twenty dollars in full for round charter of bark " Bessie," and subsequently the owners of the bark, it would seem, took up the protested draft and produced it upon the trial for surrender and cancellation. The plaintiff made no efforts to collect the amount of the draft from Poggio.

The referee, in a very elaborate opinion, arrives at the conclusion that as the draft was drawn by the defendants' agent in Cadiz upon the defendants themselves it was not a payment of the freight, which, by the charter, was payable at Cadiz in gold coin, as we have seen. In his opinion he collates and comments upon a number of cases establishing certain legal principles which, if applicable to the facts in this case, would afford abundant reasons for sustaining the judgment founded upon his report. But it is thought that he has failed to give sufficient significance to facts which distinguish the adjudications referred to and make them inapplicable.

It seems to be settled by a series of cases that when by a charter party provision is made for payment in a particular place and in a particular manner, and the debtor provides the requisite funds at the place named, if the creditor does not accept payment in the manner agreed upon he assumes whatever risk is attendant upon his omission to do so. (Abbott on Shipping, 414, 420 ; McLaughlin on Shipping [2d ed.], 484 ; 1 Parsons on Shipping and Adm., 305 ;

1 Maude & Pollock's Merchant Shipping, 387.) In this case it is to be noted that, according to the charter party, payment was to be made at Cadiz by the agent of the defendants, and that the draft which was taken by the plaintiff, in lieu of money, was drawn at his request that he might make remittances, and of course without the knowledge of the defendants; and it is to be further noted that the plaintiff, relying upon the statement of the agent that the bill was drawn upon Baring Brothers, made no personal inspection of it and thus enabled the defendants' agent to practice what appears to have been a fraud. The draft, therefore, was not only for his convenience but at his request, and his mode of procedure was a voluntary departure from the terms of the contract.

In the case of *Marsh* v. *Pedder* (4 Camp., 262), to which the learned referee refers in his opinion, a case somewhat kindred to this, the court said: "Circumstances may vary the effect of taking a bill of exchange either from the agent or the principal. If the party having the offer of cash merely for his own accommodation prefers a bill of exchange, upon that he must seek his remedy." So in the case of *Strong* v. *Hart* (6 B. & C., 160), BAILEY, J., said: "If the master of a vessel is to get payment in the best mode that he can and has no power to get anything but a bill he must take that. But if he can get paid in any better mode he should do so, otherwise he will be bound by taking a bill."

According to the doctrine of these cases it would be incumbent upon the plaintiff to show that he attempted to get the money from the defendants' agent at Cadiz, and failed, and took the draft for that reason, that being the best mode in which he could obtain payment, because cash was refused or he was unable to obtain it, and of course the opposite proposition, namely, that he must take the money if he can get it, or assume the consequences, is necessarily eliminated. *Darnell* v. *Morehouse* (45 N. Y., 64) is a case illustrative of the principle. There, after the sale of the cattle, the defendant went with the plaintiff to a banker and paid to the teller the purchase-price. The plaintiff being asked how he would have it replied in two drafts, specifying the amount. The Court of Appeals reversed the judgment in favor of the plaintiff. GROVER, J., said that the judge ought to have submitted to the jury the question whether the defendant did not provide the banker with funds with

which to pay for the cattle, and whether the banker did not pay the plaintiff in such funds as he elected to receive, and whether the draft was not received by the plaintiff, because he preferred that to currency, with instructions that if they so found the plaintiff was entitled to recover.

The same doctrine was declared in *Strong* v. *Hart* (*supra*). Lord Tenterden told the jury that if they thought the master took the bill voluntarily and for his own convenience, without insisting upon payment in cash, they were to find for the defendants.

It must be noted that the argument thus presented in favor of the reversal of the judgment appealed from rests solely and entirely upon the fact that the defendants' agent, Poggio, had the funds in his hands with which to discharge their liability at Cadiz, and that the plaintiff, if he had chosen to do so, could have received his money in cash, which he omitted to do, taking a draft for his own convenience without the knowledge of the defendants, and without any authority from them to change the mode of payment. And in this lies the distinction between this case and the decisions cited by the referee, and seemingly in antagonism, in which the elements of omitting to obtain the cash provided and taking a remittance for convenience sake do not appear.

The converse of this rule, as illustrated in this case, would enable a dishonest agent, in a foreign port, to appropriate the funds expressly provided for a payment regulated by express stipulation between the debtor and creditor, and subject the debtor to a double payment as the result of a voluntary omission by the creditor to avail himself of such funds and of adopting another mode of payment for his own convenience, if the agent be irresponsible. We think this is not within the spirit of maritime law and cannot be upheld.

Indeed, by taking the draft of Poggio Brothers the plaintiff made them the depositories of his funds and substituted them as his debtors. It does not at all affect the question that the draft was upon the defendants. They had no funds of the agent in their hands and he had no authority to make the draft. If the plaintiff had exercised ordinary caution he would have discovered the apparent trick practiced upon him, and thus protected himself from loss. He relied upon the statement of the agent as to the character of

the draft, however, and should not be permitted to take advantage of his own mischance.

The judgment appealed from should, for these reasons, be reversed, and a new trial ordered, with costs to abide the event.

DAVIS, P. J.:

By the terms of the charter-party the freight unpaid was payable at Cadiz by the consignees of the cargo, Poggio Brothers, "in Spanish gold coin, at the rate of four dollars and eighty cents to the pound sterling," * * in cash, without credit, discount or commission. The freight to an amount exceeding the sum due to the plaintiff was collected by Poggio & Brothers, and was known to the plaintiff to be in their hands.

The defendants had thus put into the hands of Poggio Brothers, as their agents, the funds with which to discharge their obligations under the charter. The plaintiff had only to demand and receive them. He did receive a portion of them but the residue he desired, for his own purposes, to remit to Baring Brothers "as soon as possible." The defendants were under no obligation to do that for him, and Poggio brothers were not their agents to make such a remission. In undertaking to make the remission at plaintiff's request, they became his agents, and if they had honestly carried out his wishes and bought and sent the draft on the Barings', the obligation of the defendants would have been fully discharged to plaintiff by the application of the amount due him to the purchase of the draft. The act of leaving the money due him in the hands of Poggio Brothers to purchase such draft was solely that of the plaintiff, voluntarily performed without the knowledge or request of defendants; and that act transferred the title of the money in the hands of the defendants' agents into the hands of plaintiff's agents. If a draft had been purchased on Baring Brothers as requested and directed and in fact sent forward as represented, the defendants would have been under no legal obligation to have followed and protected the draft if dishonored on due presentation. But the Poggios', it seems, deliberately defrauded and deceived the plaintiff by representing that they had purchased the draft and made the remission as he directed, when in fact they had themselves drawn an unauthorized draft on the defendants in

favor of plaintiff, without his knowledge and without having any funds in the hands of defendants against which they were entitled to draw. By this fraud they kept in their own hands and converted the funds supplied by defendants to pay plaintiff, and which he had chosen to have remitted for him by draft on Baring Brothers as his more convenient and safe mode of transferring them to his own country. Surely no one can claim that Poggio Brothers were defendants' agents for the commission of the fraud they perpetrated on the plaintiff. Nor were the defendants under any legal or moral obligation to take upon themselves the consequence of the fraud, which resulted from the plaintiffs own act in changing the mode of paying his freight, and thereby lose the money in Poggio Brothers' hands, of which by their cunning scheme they had defrauded plaintiff. The cases cited by my brother Brady show that under such circumstances the law will hold the defendants discharged from liability to plaintiff, leaving him to his remedy against the fraudulent parties who have got his money by false promises to obey his orders in respect to its transmission.

I concur with the conclusion of Brady, J.

Daniels, J. (dissenting):

The judgment recovered was for the balance remaining unpaid upon the freight of so much of a cargo on board the vessel of which the plaintiff was master, as was carried to and delivered at the port of Cadiz, in Spain. It was laden and carried under the terms of a charter-party made and executed between the plaintiff, as master of the ship, and the defendants, for a round trip from the United States to Spain and back again. By the charter-party the defendants became liable to the plaintiff for the payment of the stipulated amount to be paid for the service of the vessel. A portion of the amount due on so much of the cargo as was unladen at Cadiz was paid to the plaintiff, but the balance of $2,447.60 was not paid to him by the defendant's agents at Cadiz, nor by themselves, and it was for the recovery of that amount that the action was prosecuted against the defendants. While the vessel was at Cadiz, the plaintiff entered into an agreement with Poggio Hermanos, who was one of the defendant's agents there, for the purposes of the charter, that he should remit the amount in controversy to Baring

Brothers, for the benefit of the plaintiff, and he afterwards assured the latter that he had done so. But instead of remitting the money in the course of business, as that was intended to have been done, the agent drew his own draft for the amount upon the defendants, and sent that draft forward, instead of a draft remitting the money to Baring Brothers. The draft sent forward was neither seen nor received by the plaintiff until after his return to the United States, and was never accepted by him as a payment of the balance remaining unpaid upon the charter-party. Previous to the time when he left Cadiz he was assured by the agent that a draft had been purchased by him and sent forward under their arrangement, and the agent stated that he had been able to obtain it upon favorable terms as to price. In that manner he evidently led the plaintiff to believe that he had bought such a draft as was contemplated by the parties and required for the transmisssion of the funds from Cadiz to Baring Brothers, for the benefit of the plaintiff. The draft actually drawn by the agent was presented to the defendants, both for acceptance and payment. They refused to accept and also refused to pay, and it was accordingly protested. It was produced upon the trial and was there ready to be surrendered to the defendants.

By this evidence, which was not contradicted, the fact was established to the satisfaction of the referee, that the plaintiff at no time consented to receive the draft for the balance of his freight, which was drawn by the agent upon the defendants. But what he did consent to accept was such a draft as would remit the funds to which he was entitled for the balance of his freight to Baring Brothers, where he could receive the amount of money on his return to the United States. Such a draft was never at any time obtained or sent forward, and the agreement made was in no manner, therefore, performed which was entered into between himself and the defendants' agent. He never consented to receive the agent's draft upon the defendants, and had no knowledge that such a draft was drawn and sent forward until after he returned to the United States, and then for the first time discovered that his understanding with the agent had in no manner been observed. He was not bound to, and never did, accept the draft which the agent drew upon his principals, and there was accordingly no payment made of this balance of the freight earned, to the plaintiff, and the obli-

gation of the defendants for its payment was neither released nor satisfied. If the draft agreed upon had been sent forward, the money then would have been at the risk of the plaintiff, and in case of its loss the defendants would have been exonerated from further liability; but that was not done. Neither was any paper made or sent forward which the plaintiff in any form consented to receive for his freight. The case in this respect materially differed from that of *Darnall v. Moorehouse* (45 N. Y., 65), for there the creditor received precisely the paper which it was intended he should have, and by his own neglect and default rendered it unavailable to himself, and for that reason it was held that he had in the transaction relieved the defendant from liability. But in this case no fact of that description arose, for the plaintiff did not in any form consent to receive the draft or obligation of the agent and at no time accepted it, but it was drawn and forwarded in plain violation of the only understanding entered into between the plaintiff and the defendants' agent. Neither the case referred to nor that of *Smith v. Miller* (52 N. Y., 545), in any manner stood in the way of the plaintiff's right to maintain the action. And not anything was said in the case of *First National Bank v. Fourth National Bank* (24 Hun, 241) which will afford any support or assistance to the defense relied upon in the action. Where the carrier upon the delivery of a cargo voluntarily elects to receive the draft or bill of the consignee for the payment of the freight, there the law requires him to be concluded by his election, and if he fails to obtain payment in that manner the loss will afterwards be his own. But to impose this responsibility on the carrier the paper must appear to have been voluntarily accepted or received by him. This point was quite elaborately considered in *Tapley v. Martens* (8 Durn. & East, 451), where it was held in substance that the carrier would be precluded from resorting to the shipper by taking a bill of exchange, afterwards turning out to be of no value, when he should do that voluntarily and for his own accommodation. *Everett v. Collins* (2 Campbell, 515); *Marsh v. Pedder* (4 id., 257); *Robinson v. Read* (9 Barn. & C., 449); *The Salem's Cargo* (1 Sprague's Decisions, 389); *Grant v. Wood* (21 N.J. [1 Zabriskie], 292), and *Anderson v. Hillies* (10 Eng. Law & Eq., 495), sustain this principle as the law applicable to cases of this

description. Neither of them, nor any other authority which has been cited or discovered, support the proposition that the master's action against the shippers for the recovery of his freight can be defeated by the transmission from the consignee, for his benefit, of a bill which the carrier not only did not agree to receive in any event, but had taken care to stipulate for the transmission of his balance by what was contemplated between the parties as a banker's draft. The paper which was sent forward was an intentional as well as a plain violation and departure from the understanding entered into between the plaintiff and the consignee. And as it could not have the effect, without being accepted by the former, of relieving the defendants from their liability for the payment of the balance of the freight, the referee was right in holding them liable to that extent in the action. (*Shepard* v *De Bernales*, 3 East, 565; *Grant* v. *Wood*, 1 Zabriskie, 292.)

On the return of the vessel she was laden with salt, under the authority of the defendants, to be delivered at Gloucester, in the State of Massachusetts. Upon her arrival there and the delivery of the salt the plaintiff received from the consignee the sum of $1,920, for which he gave a receipt, declaring it to be in full for the round charter of the bark Bessie. This was the precise amount remaining unpaid for the carriage and delivery of the salt. It included no part or parcel of the balance payable upon the outward cargo, but the settlement with Barker was only for the freight upon the salt, and for that reason the statement in the receipt that the payment was in full for the round charter of the bark in no way relieved the defendants from the liability incurred by them, through the charter party, for the payment of the balance of the freight earned by the carriage and delivery of the outward bound cargo. The receipt, under a very well settled principle, was subject to explanation, and that which was given, and in no manner contradicted, showed that its sole and only purpose was to settle the freight payable for the carriage and delivery of the salt. The referee was right in holding the defendants liable for the balance still unpaid to the plaintiff, and the judgment should be affirmed.

Judgment reversed, new trial ordered, costs to abide event.